3090739, people of the state of Illinois, athlete by the name of Kennedy Murdoch v. Billy S. Carney, appellant by Joel Murphy. Mr. Murphy, you may proceed. May it please the Court, Madam Bailiff, Madam Clerk, Ms. Murdoch. Good morning, Your Honors. Good morning. My name is Joel Murphy. I represent the appellant, defendant Shane Carney. I'm here today asking this Court to fix the mistakes of the trial court which have resulted in an innocent man being imprisoned and taken away from his daughter. These mistakes include improperly allowing certain hearsay statements pursuant to Section 115-10 of the Code of Criminal Procedure and also the finding that the evidence was sufficient to prove Shane guilty beyond a reasonable doubt. With regards to the hearsay statements, Your Honors, three statements were sought to be admitted by the State and two were actually admitted. One were the statements of the victim, K.C., to her mother, Kim, on November 3rd of 2007. The other were statements of K.C. to Mary Jane Pluth, who was the forensic interviewer, which I refer to as the victim sensitive interviewer, the VSI, which was conducted just two days later on November 5th, 2007. Now the record clearly shows that the trial court abused its discretion in admitting these statements because the statements are only admissible after the State showed that the time, content, and circumstances of the statements provided sufficient safeguards of reliability. Viewing these factors together, they failed to provide such reliability. As to the time and circumstances of these statements, first, Your Honors, the acts which were alleged to have been committed were alleged to have been committed between January 1st of 2007 and November 3rd of 2007. Now, Shane and K.C.'s mother, or K.C.'s mother, Kim, separated from Shane in 2003. K.C. primarily lived with Kim until May or October of 2005, which K.C. then lived with and paid Kim $500 a month for child support, not court ordered or anything, even though she lived with Shane primarily, and he paid her for a few months, until he told her that he couldn't keep paying because he had to get K.C. in a preschool. Shane subsequently had to get an order of protection against Kim due to threats made by her after that. Kim filed for divorce. Residential custody was given to Shane. The court ordered Kim to stop exposing K.C. to recreational settings with nude adults because Shane learned K.C. was in a hot tub with naked adults. These adults were Kim's mother and boyfriend, who live in Indiana and attend a nudist resort nearby. They also babysat K.C. on occasion. Now, in November of 2006, Kim was the subject of a DCFS investigation regarding allegations involving her boyfriend and K.C. Kim had assumed these allegations. After the divorce was finalized in December of 2006, Kim was ordered to pay support and she was admittedly upset about this court's ruling, the court's ruling. She failed to pay and a rule was entered against her. She was subsequently found to be in contempt and ordered to pay arrearages. Visitation also had to be amended due to the animosity between Kim and Shane during drop-offs and pick-ups. Now, on the particular weekend of this outcry, Kim and K.C. had spent the night at Kim's mother's house in Indiana, the nudists. K.C. and her six-year-old friend and neighbor were over there as well. They were going to get into the hot tub, so they got into their bathing suits. They began rolling their, according to Kim, began rolling their tops up underneath their breasts saying things like they look sexy. They returned home that next day and had dinner. Kim claimed that before K.C.'s bath time they had this absurd conversation about K.C.'s body parts. Then, while in the tub, that's when the statements of K.C. came about. Now, in determining the reliability of the statements, the court looks at many factors. A couple of these are the timing of these statements and the spontaneity. Now, we're unable to determine the timing as it's unclear how long there was a delay in the report of abuse. Obviously, certain cases say that delay, while there is a delay, that's not dispositive of whether or not this is reliable. Swartz said a five-week delay was too much considering the other factors and adult manipulation that was present. And I think that's similar to this case. We're not even able to say whether this was five weeks delay, whether there was any delay because Kim asked K.C., when did this abuse happen? K.C., or do you know when it happened? She said no. She couldn't remember whether it was daytime or nighttime. The only timing issue that we can get from that statement is she had asked if Uncle Phil had moved in yet. Uncle Phil, Phil Keener was the friend of the defendant. They called him Uncle Phil. He had moved in in August. Kim asked if Uncle Phil was living there yet and K.C. said no. Now, also, this couldn't be any further from being spontaneous. The adult intervention was obvious and it was obvious to the trial court. The trial court even said that because while in the tub, Kim approached the subject about good touches and bad touches and proceeded to tell K.C. that there are bad people in the world that like to touch kids on their bottoms. She then even proceeded to tell her that someone touched Mommy when she was little and it wasn't okay. And she told her this before she asked her if she had been touched. The court recognized that these statements were not spontaneous and they were only garnered from the mother's questioning. In addition to the timing and spontaneity problems, K.C.'s statements lacked consistent repetition from one telling to the next. And this one telling to the next, Your Honors, are only two days apart. The statements to Mom and then the statements in the V.S.I. According to Mom, there was nothing about any touching with hands or anything. Mom also claimed that K.C. said Daddy put his mouth on her bottom. If you look at the V.S.I., within two days later, K.C. said that he touched her bottom or vagina with his hand. Now, this court looks at the language of sexual activity beyond their age. But that's not what happened here. She doesn't say that he did anything with his hand, that he rubbed or moved it in any way. In fact, Mary Jane asked her, okay, so there's a pat with the hand. Is this what he did? No, no, he just touches. Mary Jane asked her about kissing. Did he kiss you anywhere on your body? She pointed to her lips. She repeatedly denied Dad putting lips anywhere else on her body. That's completely inconsistent with Mom says K.C. said just two days earlier. Kim claimed that K.C. asked Daddy to stop and that Daddy also said in a minute. In the V.S.I., K.C. says Daddy doesn't say anything. He didn't say anything while any of this was going on. Again, these statements are just two days apart. Furthermore, very importantly, in the V.S.I., K.C. repeatedly, at least four times, repeatedly denied telling her mother. Now, Kim, the mother, her motive to fabricate is clear in the record, and I think I discussed much of that. But another factor is whether these statements were a cry for help. Your Honors, in the V.S.I., K.C. says she lives with Dad most days. She always sleeps in Dad's bed because she loves sleeping with Daddy. It's her idea to sleep in Dad's bed. There's nothing she doesn't want Daddy to do at home other than ground her or yell. That's irresponsible. Is there anything you don't like while you're at Daddy? Anything you don't like him to do? Well, I don't like when I get grounded. I don't like when he yells at me. Anything you like at Mom's? Well, I don't like when she smokes. Even at the end of the interview, after all what I mentioned, that Mom posts her to come out, even after all of that, at the end of the interview, she's asked where she wants to live the most. She says, at my Daddy's. No one can reasonably conclude this to be a cry for help, and it's not consistent with common experience in life. Due to the timing, the lack of spontaneity, the lack of consistent repetition, the motive to fabricate on behalf of Kim, the absence of a cry for help, I'm asking you to find that the court abused its discretion in finding that the time, content, and circumstances provided sufficient safeguards or reliability, and the decision to admit those statements should be overturned. Taking the aforementioned with the evidence, it's also clear that the evidence was so unreasonable that it cannot support a finding of guilt. While not dispositive, Your Honors, there's no physical evidence or corroboration of any sexual act. While a prompt complaint may be sufficient corroboration or held to be corroboration, again, there's none here. There's no way for us to tell how prompt this complaint was, because it's unclear when any abuse, when the last time, first time, or any time, actually occurred. How long was it, how long prior to this was it that Phil, the roommate, moved in? The statement to Mom was November 3rd of 2007, and according to the evidence in the record, Phil moved in in August. So this would only have been a few months prior. According to Kim, Casey could not say when abuse occurred other than before Phil was living there, and a little more than once. However, at trial, on direct, Casey testified that it happened when Phil was living there, but he was not at home. Now this conflicted with her statement to Mom and the VSI. As Phil moved in in August 2007, this was only a few months prior to November, the statements to Mom. She could not say whether it were daytime, whether it were nighttime, whether it were light or dark out, whether it were lunchtime. More importantly, she could not state whether it happened before or after Halloween, which would have only been a few days prior to the statement to Mom. Kim claimed, she asked, why didn't you tell Mommy before? Casey said, Daddy would get angry and go to jail. That's the only spot in the record that you'll ever find any kind of alleged threat or anything coming from Daddy for her that it's wrong or not to tell anybody because I would go to jail or get angry. Casey never testified that the defendant said any of these threats or to keep quiet, and Casey denied telling Mom repeatedly in the VSI. Now at trial, she testified she did tell her Mom. Well, let's look at that testimony. Why didn't you tell Mom right away? Because I didn't know. Didn't know what? That to tell my Mom. Do you remember when it was you told Mom? No. Do you remember the first time you told Mom? I don't know the question. Okay, you don't understand what I'm  On cross, Casey remembered going on vacation that summer with Mom and Dad. She said she had fun. Went on vacation. Did you tell your Mommy about these things, these bad touches about Daddy? Yes. You told her then on vacation? Uh-huh. On redirect, she was asked if she would like to change any of her answers or if any of the previous answers were untrue. She said no. Then she's asked, now one of the things you were asked is if you told your Mom about this when on vacation. And she pipes up and says no. Okay, did you tell Mom on vacation or hadn't you told her yet? Hadn't told her yet. I'll give you two minutes. Thank you. At trial, Casey was asked what happened after you and Daddy were on the bed with no clothes on? Nothing else happened. Did you guys do anything? No. Did you see anything happen? No. The trial court held that the case came down to the believability of Casey because it totally disregarded Mom's testimony, even though it found the same story to be reliable enough to admit the statements earlier. But it said it all comes down to Casey. Even though the court acknowledged Casey lied previously in front of another judge, saying she had never saw another boy's penis and told another judge that Mom told her Dad was saying she was untruthful about these things, the judge gave little weight because he said she wasn't under oath and she was afraid. That was quite arbitrary because she claimed she didn't know what she was scared of. She couldn't answer that question. She's just saying I'm scared because that's what Mom told her to say. She didn't understand an oath. So how do you give any weight to whether she gave an oath or was under oath in one proceeding and not the other? Well, she doesn't understand the oath, nor was she under oath in the DSI. The court felt that Casey's statements could only come from experience, not an observation, because she said the penis was, quote, hard like a stick. But those are Mary Jane's words, not Casey's words. And when she said, when the water squirts out, we're done. That's the court's quote. But that was not the tense that Casey used. She said when the water squirts out, you're done. As if repeating what she's been taught or told happens. It's not reasonable to infer that the only way she acquired this knowledge was through experience. It's undisputed that she was exposed to this book called Facts About Sex, with graphic pictures talking about sex and sexuality. It discusses semen ejaculation as being a whitish, sticky fluid. Casey has also read it. Kim read it to her, showed it to her, and, quote, went further than just answering questions, because she doesn't hold anything back from her daughter. She's seen the pictures. She went on to spell words from the book, and she could look at it. Combine this with the nudist campground upbringing. Casey had been there as recently as six years old. Kim first claimed she hadn't been there since two. Then she admits that she may have been there on occasion with grandma to pick up a rake or shovel, but it'd usually be in the winter months where people were wearing clothes. But she cannot be sure if she's seen other people naked because she was not with her. Thank you. Ms. Murnell, you may respond. Thank you. May it please the Court and Counsel, I'll be brief in my responses. His first argument is that the trial judge abused his discretion. He complains first about timing. He cites the Swart case in support of his claims, which is a Supreme Court case. And if you look at that case, that three-year-old victim, and the victim had been in hospital for a while, like five days before her statements were made to her mother. And the reason the Court kept her statements out were because they thought she might have learned the unusual terms and sort of what happened from three. She'd been interviewed by other people and heard them from this. And that's not what happened in this case. This victim talked to her mother. The next person she talks to is Mary Jane Fluth. There's no allegation here that there's a big lapse in time between her talking to her mom and Mary Jane or that anybody influenced her ability to say what happened. And when he talks about the book, Facts About Sex, it's clear in the record the child didn't see that until after all this was reported and her statement had been made to Mary Jane Fluth. So that could not have influenced her statement to Mary Jane Fluth. Also, the time that the statement was made, if you look in the record at pages 45 and 57, I cite them in my brief, you'll see that she told her mother that this happened before and after Phil lived there. So if she said it happened before and after Phil lived there and Phil lived there in August, it happened sometime between August and November. So I think that helps narrow down the time span because the victim testified in at trial that it happened before and after Phil lived there and she also in her statement to mother, it's cited in my brief on page 6, at record 45 and 57, that she told her mother this happened before and after Phil lived there. So I think that's relevant in turning down the time. And the contents of the statement I would just ask you to look at the statements themselves. It's clear in both the statement to Mary Jane and to her mother, she said that these happened in bed, in her dad's bedroom. She said that they happened more than once. She said their clothes were off. There's a lot of consistency there between what she said to her mother and what she said to Mary Jane Pluth. And if you look at Mary Jane Pluth's questioning, Mary Jane is a qualified victim-sensitive interviewer. She has great background for doing this and she testifies that she did not ask leading questions. I'd ask you to listen to the tape. Find out if those are leading questions. She does ask some yes or no questions, but they're not leading questions. She does ask, you know, was it hard or was it soft? But she doesn't say it was hard, wasn't it? She says, was it hard or was it soft? And that's when she's attempting to narrow down exactly what happened, she asks more direct questions. And the judge in particular was somewhat persuaded by the victim's testimony that when the water comes out, what happens? That's what Mary Jane's question was. And she says, you're done. And that was not a leading question. And the judge said that somebody this little girl's age would not have known that except for her experience. That wasn't something she observed. And there isn't testimony in the record that this little girl was at this the nudist colony after she was two. The mother testifies that after she was two, the only time she went back was in the winter. And there is some testimony from dad about the little girl having told him that she had seen her relatives, her grandma and her grandma's boyfriend in the hot tub. And that's why they had the order of protection to keep the kid away from any nudity by adults. But there's nothing from the kid. The kid's never testified to that. It was just hearsay from the father that's in the record. The other thing I wanted to address was the fact that she had made a prior statement to the other judge who was in the divorce proceedings, apparently. I think that in that, I would ask you to read that entire record. It's clear the victim is reluctant to talk to the judge. And he perhaps didn't do a good job. He's not a victim-sensitive interviewer. And I think that's apparent from the record that the little girl was afraid to tell him what happened. But if you read what she says, she basically does say something happened and daddy's lying. And if you read the state's case, he had referred in his brief to the doctor who examined her and the koberoff. There was no physical evidence to cooperate. The little girl never said there was any penetration. So you wouldn't expect him to have physical evidence, to find physical evidence of penetration when the little girl said there was none. The victim never said there was penetration. And the victim did tell the doctor that why she was there was because of what daddy had done to her. So I think that's corroborative rather than against the state's case. If you have any questions, I'd be happy to answer them. Mr. Murphy, you may reply. The first point I'd like to respond to, Judge, is the state has contended that there's no evidence that the victim's mother was the one who reported the statement to mom and the statement to Mary Jane Cluth. However, we don't know what happened, actually, on this weekend where mom relays the incidents of this outcry because she was found not to be believable. So what was she actually doing with Casey prior to taking her to this victim's sense of interview and prior to reporting this to the police? Now, the state contends it's clear in the record that Casey had not seen these books, this facts about sex book, until after the outcry. The only thing in the record that says that is, again, the unbelievable testimony of Kim Carney, the self-serving statement that, oh, well, I showed her this book, you know, the outcry was in early November, but I showed her in late November or early December. If you look at the record, she actually had this book prior to that, and I believe that it was lying around. It's possible Casey had it. And plus, the court just didn't believe anything Kim had to say. She doesn't hold back from her daughter, and it is very clear in the record it was possible that Casey had seen this stuff prior. Also, the state says that I misread the testimony because Casey told her mother it happened before and after Phil lived there. She changed her story, Your Honors. In the initial outcry, she says it happened before Phil lived there. At trial, that's when mom says, oh, she told me it happened before and after Phil lived there. The state contends Mary Jane, the reason that Casey may have felt comfortable or uncomfortable in one setting or another is because Mary Jane is a trained forensic interviewer, but this court hasn't hesitated before to find that her methods may have been used to prepare a prosecution or things of that nature, use leading questions. The reason there's no corroboration or no penetration is because if that were mom's allegations, she knew that would not have been able to be proven. I'm asking Your Honors to look carefully, look carefully at the record, watch the videotape, look at the evidence, and I'm confident you'll find that you will not share in the trial court's confidence in the complainant's testimony. It's too unreasonable. It's too contrary to human experience and is insufficient to support a finding of guilt. And the alternative, evidence was clearly improperly admitted. And I would ask the court to overturn that decision and remand the case for new trial. Thank you. The trial court found Kim to be untrustworthy or untruthful in all regards? Explicitly. In all regards. In fact, the trial court said that her version of the events defied human nature were the words of the court. Thank you. Any other questions? Thank you, counsel, for your arguments in this matter this morning. It will be taken under advisement that this disposition shall be issued. The court will stand in recess.